# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

SERGIO R. PEREZ (minor) by and,     )
through MARIA RIVERA ABUNABBA   )
(as mother and next of kin)        )
                         )
          Plaintiffs,      )    CIV. NO.: 1:06-cv-0080
      v.                  )
                         )
UNITED STATES OF AMERICA and    )
NATIONAL PARK SERVICE,       )
U.S. DEPARTMENT OF INTERIOR    )
                         )
         Defendants.     )
_____)

## MEMORANDUM OPINION AND ORDER

Finch, Senior Judge

This matter comes before the Court on Defendants United States of America and National Park Service's (the "Government" or "Defendant") Motion to Dismiss, or in the Alternative for Summary Judgment.

## I.   Introduction

While playing in the shallow water near the shore of the Buck Island Reef National Monument ("Buck Island Monument"), Plaintiff Sergio Perez was bitten by a barracuda and suffered a severe laceration of his foot. Plaintiff, through his mother, Maria Rivera Abunabba brings this negligence and premises liability action against the Government under the Federal Tort Claims Act ("FTCA"), alleging that the National Park Service ("NPS") failed to adequately warn visitors about the dangers of barracuda and failed to properly staff Buck Island Monument.

1

The Government seeks dismissal of Plaintiff's complaint on the grounds that this Court lacks subject matter jurisdiction over Plaintiff's claims because the conduct complained of is a function of social policy and therefore excluded from the ambit of the FTCA under what is known as the "discretionary function exception."

**II.** **Background**

The Buck Island Monument is a unit of the National Park System under the control and management of the NPS. (Def.'s Statement of Facts ("DSF") ¶ 1; Pl.'s Response to Def.'s Statement of Facts ("PRSF") ¶ 1.)  Prior to 2001, the Buck Island Monument consisted of Buck Island and 704 marine acres surrounding Buck Island.  (DSF ¶ 2; PRSF ¶ 2.)  In 2001, President Bill Clinton expanded the boundaries of the Monument from 704 marine acres to 18,869 marine acres designated as a marine protected area.  (DSF ¶ 3; PRSF ¶ 3); *see also* Proclamation No. 7392, 66 Fed. Reg. 7336 (January 17, 2001).  The Proclamation directed the Secretary of the Interior to "prohibit all extractive uses." *Id*.  Pursuant to this directive, beginning in the end of 2003, the NPS closed Buck Island Monument and its surrounding waters to fishing.  (Deposition Transcript of Hillis-Starr ("Hillis-Star Depo.") 54:21-55:18, attached to Doc. 76; Deposition Transcript of Tutein ("Tutein Depo.") 46:12-25, attached to Doc. 76.)

Buck Island is accessible only by watercraft, and is open to the public for recreational activities. (DSF ¶ 4; PRSF ¶ 4.)  Off the east end of Buck Island, the NPS has established an underwater marine trail, frequented by visitors.  (Buck Island Reef Brochure, Doc. 56-2, attached as Ex. 2 to Declaration of Zandy Hillis-Starr ("Hillis-Starr Decl.").)  All owners of vessels wishing to visit Buck Island must apply for an anchoring permit, and receive approval to anchor off the West Beach area of the island. (DSF ¶ 5; PRSF ¶ 5.)   At the time of the application

process, owners of vessels planning to visit Buck Island receive a packet of information that includes a park brochure. The brochure provides general information about Buck Island, including natural hazards unique to Buck Island. (DSF ¶ 6; PRSF ¶ 6; Hillis-Starr Decl. ¶ 7, Doc. 56-1.) A section of the brochure labeled "Safety Tips for Sea and Shore" warns visitors of potential encounters with certain marine animals and states that "[b]arracudas and sharks, if encountered should be treated with caution but are not usually aggressive toward snorkelers." (Buck Island Reef Brochure at 3; Hillis-Starr Decl. ¶ 8.) The same information contained in the brochure is posted on signs located on Buck Island at the picnic areas at West Beach and Dietrich's Point Picnic Shelter. (DSF ¶ 7; PRSF ¶ 7.)

On May 9, 2004, during a visit to Buck Island with family members, then 12 year old Plaintiff Sergio Perez was bitten on the foot by a barracuda while he sat on the beach with his feet in the shallow water. (DSF ¶ 11, PRSF ¶ 11.) Plaintiff's third and fourth toes were nearly severed and he required surgery to repair them. Following surgery, Plaintiff underwent months of medical treatment for his injuries. (DSF ¶¶ 12-14; PRSF ¶¶ 12-14.)

Barracuda is an indigenous species of fish commonly found in the waters of the Caribbean Sea, Virgin Islands and around Buck Island. It is not known to attacks humans, but may do so when it mistakes an object attached to a limb or other body appendage for prey. (Hillis-Starr Decl. ¶ 9.) Prior to the Plaintiff's barracuda bite, NPS officials were aware of one instance of a barracuda attacking a human at the Buck Island Monument. In that attack, which occurred sometime before 1999, a boat captain was bitten while sitting on the side of his trimaran with his feet dangling in the water after pouring the remnants of his can of tuna fish into the water. (Hillis-Starr Depo. 32:9-43:1; Tutein Depo. 22:7-23:24.) At the time of that attack,

there were multiple snorkelers in the water, none of whom were accosted by the barracuda. (Hillis-Starr Depo. 32:18-25.)

## III.  Discussion

### a.  Standard of Review

The Government challenges Plaintiff's complaint under both Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state claim.  There is a significant difference in the standard of review between these two Rules.  Under Rule 12(b)(6), the Court's task is to determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009)).  And when ruling on a 12(b)(6) motion, the Court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in favor of the nonmoving party.  *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d Cir. 2009).

In contrast, a Rule 12(b)(1) motion challenges the court's subject matter jurisdiction to hear the case.  *Robinson v. Dalton*, 107 F.3d 1018, 1021 (3d Cir. 1997); Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion can take two forms.  A "facial attack" is similar to a Rule 12(b)(6) motion to dismiss and challenges "whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." *Common Cause of Pennsylvania, v. Pennsylvania,* 558 F.3d 249, 257 (3d Cir. 2009) (citing *Taliaferro v. Darby Twp. Zoning Bd*., 458 F.3d 181, 188 (3d Cir. 2006)).  On the other hand, a "factual attack" challenges the existence of facts sufficient to confer subject matter jurisdiction.  *Carpet Group*

*Intern. v. Oriental Rug Importers Ass'n, Inc.,* 227 F.3d 62, 69 (3d Cir. 2000). When a Rule 12(b)(1) motion raises a "factual attack," "a trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case . . . [U]nder a Rule 12(b)(1) motion to dismiss no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Robinson,* 107 F.3d at 1021 (citing *Intern. Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc*., 673 F.2d 700, 711 (3d Cir. 1982) and *Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). When a factual attack is brought under Rule 12(b)(1), "[t]he plaintiff has the burden of persuasion to convince the court it has jurisdiction." *Gould Electronics Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

To determine which 12(b)(1) standard applies, the Court must look at the specific challenge raised by the Government. *See Cestonaro v. United States,* 211 F.3d 749, 752 (3d Cir. 2000). Here, the Government challenges this Court's subject matter jurisdiction on the grounds that the acts (or failures to act) complained of by Plaintiff were discretionary, informed by policy concerns, and therefore carved out of the reach of the FTCA under what is known as the "discretionary function exception." *See* 28 U.S.C. § 2680(a). The discretionary function exception usually requires a "fact-specific" inquiry. *Mitchell v. United States*, 225 F.3d 361, 365 (3d Cir. 2000). Accordingly, the Third Circuit has often treated Rule 12(b)(1) subject matter jurisdiction challenges based on the exception as "factual attacks," requiring an examination of the facts and evidence. *See Merando v. United States*, 517 F.3d 160, 168 n.1 (3d Cir. 2008) ("Clearly we can examine the facts . . . on this appeal from a dismissal predicated on the want of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).") (citation omitted);

*Cestonaro,* 211 F.3d at 752 ("Because the government's challenge to the District Court's jurisdiction was a factual one under Fed.R.Civ.P. 12(b)(1), we are not confined to the allegations in the complaint (nor was the District Court) and can look beyond the pleadings to decide factual matters relating to jurisdiction."); *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997) ("Because the [defendant]'s motion was not merely a facial challenge to the district court's jurisdiction, the court was not confined to allegations in the plaintiff's complaint, but could consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction.").

In addition, both the Government's Motion and Plaintiff's opposition are supported by matters outside the pleadings including declarations, depositions of NPS officials, NPS manuals and documents, and interrogatory responses.[1] Based on the type of challenge made by the Government, the amount of factual discovery that has taken place, and the extrinsic documents relied upon by the parties, the Court finds that it is more appropriate to treat the Government's motion as a factual attack under Rule 12(b)(1) rather than as a facial attack under Rule 12(b)(1) or a motion to dismiss under 12(b)(6). *See, e.g., Gabriel v. United States*, 2009 WL 22289, at *2 (M.D. Fla. 2009) (determining that the government's 12(b)(1) motion was a factual attack in discretionary function case "because both parties proffer extrinsic evidence for the Court's consideration.").

One final caveat regarding the standard of review must be made. "[W]hen the merits and jurisdiction are closely related, a court may determine subject matter jurisdiction without reaching the merits, so long as the court 'demand[s] less in the way of jurisdictional proof than

---

[1] The parties have conducted significant discovery in this case, including written discovery and depositions. The factual discovery deadline closed on August 15, 2008. (*See* Scheduling Order, Doc. 39.)

would be appropriate at a trial stage.'" *Gould Electronics v. United States,* 220 F.3d 169, 178 (3d Cir. 2000) (citing *Mortensen*, 549 F.2d at 891) (determining that court lacked subject matter jurisdiction to hear indemnity claim under FTCA); *see also CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008) ("[W]hen faced with a jurisdictional issue that is intertwined with the merits of a claim, district courts must demand 'less in the way of jurisdictional proof than would be appropriate at a trial stage.'") (citing *Gould Electronics*, 220 F.3d at 178). Here, as discussed more fully below, the issue of the Government's knowledge of the risk of barracuda attacks is relevant both to the application of the discretionary function exception and the merits of Plaintiff's negligence claim. Accordingly, this Court will review the Government's Motion under Rule 12(b)(1) and need not accept Plaintiff's allegations as true or construe evidence in the light most favorable to Plaintiff, but, to the extent that the jurisdictional issue is intertwined with the merits of his claims, will demand less jurisdictional proof from Plaintiff than required at trial.

### b. The Discretionary Function Exception

Plaintiff brings his claims under the Federal Torts Claim Act, 28 U.S.C. § 2674.[2] "The Federal Torts Claims Act is a partial abrogation of the federal government's sovereign immunity that permits suits for torts against the United States." *Gotha,* 115 F.3d at 179.[3] However, under what is known as the "discretionary function exception," the FTCA imposes a significant statutory limitation by providing that no liability may be asserted for a claim "based upon the

---

[2] The FTCA provides that the "United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances . . ." 28 U.S.C. § 2674.

[3] Plaintiff brings claims against both the United States and the NPS. However, "[c]laims brought under the FTCA . . . may only be brought against the United States; federal agencies are never appropriate defendants."*Nazaro v. United States*, 304 F.Supp.2d 605, 616 (D.N.J. 2004) (citing 28 U.S.C. § 2679). Accordingly, Plaintiffs claims against the NPS will be treated as claims against the Government.

exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id*. (citing 28 U.S.C. § 2680(a)). "The exception marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Cestonaro*, 211 F.3d at 753 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)). The exception "does not apply to every situation in which there is an actual option to choose between courses of action or inaction. Rather . . . the discretion that is immunized . . . in the tort suit context applies to 'legislative and administrative decisions grounded in social, economic, and political policy.'" *Gotha*, 115 F.3d at 179 (quoting *Varig Airlines*, 467 U.S. at 814). The reason for this caveat is to "protect the government from liability that would seriously handicap efficient government operations." *Varig Airlines*, 467 U.S. at 814. The "plaintiff . . . bears the burden of demonstrating that his claims fall within the scope of the FTCA's waiver of government immunity, but the United States has the burden of proving the applicability of the discretionary function exception." *Merando*, 517 F.3d at 164 (citations omitted).

To determine the applicability of the discretionary function exception, courts in this circuit apply a three-step analysis. The "preliminary" step is simply to identify the government conduct that forms the basis of the complaint. *Cestonaro*, 211 F.3d at 753. Once the conduct has been identified, the next step asks whether "the act giving rise to the alleged injury and thus the suit involves an 'element of judgment or choice.'" *Merando*, 517 F.3d at 164 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). This inquiry hinges on whether "a federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). If the statute, regulation or policy compels specific conduct, "the employee has no rightful option but to adhere to the directive. Consequently, there can be no lawful discretionary act." *Gotha*, 115 F.3d at 179 (quoting *Berkovitz*, 486 U.S. at 536). On the other hand, if the government's conduct is not specifically prescribed by statute or regulation, the action is discretionary and the court must proceed to the final element of the test. *Cestonaro*, 211 F.3d at 755.

The final step asks "whether the challenged action or inaction is of the kind that the discretionary function exception was designed to shield." *Gotha*, 115 F.3d at 179 (quoting *Berkovitz*, 486 U.S. at 536). The "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by the statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Merando*, 517 F.3d at 165 (citing *Gaubert*, 499 U.S. at 325). Whether a decision is subject to "policy analysis" turns on whether the decision "is grounded in social, economic, and political policy." *Id*. (citing *Gaubert*, 499 U.S. at 322-23). "If a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324.

### i. Conduct at issue

In his complaint, Plaintiff alleges that "Defendant NPS created and or maintained a dangerous condition on Buck Island in that: [1] there were no signs on the premises of Buck

Island warning visitors of the existence of barracudas and/or large predatory fish on or near the premises of Buck Island [and 2] . . . no park ranger was on duty at Buck Island to perform such necessary services, including, but not limited to, providing safety information and first-aid treatment to visitors and contacting the appropriate authorities in the case of an emergency . . . Defendant NPS knew or should have known of the dangerous conditions it created on Buck Island." (Compl. ¶¶ 22-24).[4]

The second part of Plaintiff's negligence claim is straightforward – the NPS was negligent in failing to staff Buck Island with park rangers. However, the first part of his negligence claim – the failure to warn – requires more analysis. First, as defined in his opposition papers, Plaintiff's failure to warn claim does not allege that there was no warning at all regarding the presence of barracuda at Buck Island Monument; Plaintiff acknowledges that the park brochure and signs at the park warned of encountering barracuda while snorkeling. (PRSF ¶¶ 6-7; Plaintiff's Counter Statement of Facts (PCSF) ¶¶ 9-11.) Rather, Plaintiff's claim is that "[v]isitors to the Monument are not warned about the potential danger a barracuda possesses to them if they are actually still on the shore." (PCSF ¶ 16.)

Second, Plaintiff's claim that "the NPS knew or should have known of the dangerous conditions it created on Buck Island" must also be refined. The question of whether the NPS knew of a danger and failed to warn is significantly different from whether the NPS should have known of the danger as the latter may implicate the method or plan by which the NPS identifies hazards. *See, e.g., Merando*, 517 F.3d at 169 (finding that plaintiff's "claims regarding the

---

[4] The Government acknowledges that these allegations form the basis of Plaintiff's claims. (Gov.'s Mot. at 12, Doc. 57.)

Government's alleged negligent failure to find and remove the tree essentially are a challenge to the Park Service's plan for finding and managing hazardous trees.").

Regarding his allegation that the NPS "knew . . . of the dangerous condition," Plaintiff has presented little evidence that the NPS had identified barracuda as posing a serious risk to shallow water bathers. Plaintiff states that "[p]rior to May 9, 2004, the NPS was aware that barracudas presented a hazard to humans and could be encounter [sic] in the first several feet of the shoreline." (PCSF ¶ 5.) However, while NPS officials recognized that *encountering* barracudas near the shore was possible, Plaintiff has presented no evidence that the NPS believed their presence near the shore was a danger to bathers. Moreover, the evidence presented by the Government shows that the NPS did not consider barracuda as posing a serious threat to shore bathers. The record reflects that out of hundreds of thousands of Buck Island visitors over the last several decades, Plaintiff was the first close-to-shore bather bitten by a barracuda. (Hillis-Starr Depo. 71:9-18; Hillis-Starr Decl. ¶ 10). Zandy Hillis-Starr, the local NPS official responsible for overseeing marine research in St. Croix, testified that she was unaware of any prior barracuda attack at the shoreline of Buck Island in her 22 year employment with the NPS on St. Croix and that an attack near the shoreline like the one on plaintiff was "unusual." (Hillis-Starr Depo. 71:9-18.) The only barracuda attack at or near Buck Island that the NPS was aware of prior to Plaintiff's attack occurred in deeper water at an underwater snorkel trail off of the east side of the island and involved a boat captain covering his own toes in fish oil prior to submersing them in the ocean. (Hillis-Starr Depo. 32:9-33:22; Tutein Depo. 22:7-23:24; 60:3-

13.)[5]  The NPS attributed this attack to the presence of fish oil on the captain's toes; the captain

blamed himself for the attack.   (Hillis-Starr Depo. 32:18-33:7; Tutein Depo. 52:22-53:2.)

Accordingly, there is insufficient evidence, even under the lightened evidentiary standard

imposed by *Guild Electronics* and *CNA*, to support the inference that the Government "knew" of

a danger of barracuda attacks in shallow water and this absence of evidence eliminates this prong

from Plaintiff's failure to warn claim.[6]  *See Merando*, 517 F.3d at 168 ("[T]here is simply neither

direct evidence nor evidence from which an inference can be drawn that the Government topped

the tree and this absence of evidence as a factual matter eliminates from this case Mr. Merando's

claim that Park Service personnel violated a mandatory policy not to 'top' trees.").  Accordingly,

the conduct at issue is the Government's failure to identify the danger complained of by Plaintiff,

its concomitant failure to warn of this danger and the NPS staffing decisions regarding Buck

Island.[7]

---

[5] In response to this incident, NPS officials warned local boat captains "not to feed the fish and not put any leftover food in the water."  (Tutein Depo. 25:2-7.)

[6] Plaintiff also contends that because NPS officials were aware of an increase in the barracuda population, they knew of the danger of a shallow water barracuda bite.   (PCSF ¶¶ 23-25.)  This argument is unconvincing.  As a matter of fact, local NPS officials disagreed over whether the fishing ban resulted in an increase in the barracuda population.  (Tutein Dep. 47:6-14; Hillis-Starr Depo. 55:23-57:9.)  Second, even assuming that the fishing ban resulted in an increase in the barracuda population, Plaintiff offers no evidence that NPS officials considered such an increase to present a danger to those playing on the beaches of Buck Island.

[7] Plaintiff also asserts a premises liability claim. (See Compl. ¶¶ 28-30.)   However, Plaintiff's premises liability claim is based on his negligence claims against the Government both in fact and law. (*Id.* at ¶ 29 ("The conduct of Defendants . . . constitute negligence subjecting Defendants to premises liability)); *see* Restatement (Second) Torts § 343 (possessor of land may be liable to invitees for physical harm caused by condition on the land only if he "knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and . . . fails to exercise reasonable care to protect them against the danger.").

## ii.   Does the conduct at issue involve an element of discretion?

Regarding the second step, whether the acts giving rise to the alleged injury involve an "element of judgment or choice," the facts and law demonstrate that the NPS is given discretion regarding hazard identification, signage and staffing.  Pursuant to 16 U.S.C. § 1, the NPS is charged with "regulat[ing]" national parks through "means and measures" designed to "conserve the scenery and the natural and historic objects and the wild life therein and [] provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."  To that end, the NPS has established its own policies and internal operating procedures dealing with public safety and signage.  (*See* Directors Order # 50C, "Public Risk Management Policy" [Doc. 57-1]; Director's Order # 52C, "Park Signs" [Doc. 57-2]; "2001 Management Policies" [Doc. 57-3]; "National Park Service Sign Manual" (Revised January 1988) [Doc. 57-4].)[8]

These orders and policies give local NPS managers and supervisors discretion in decisions regarding signs, personnel, and safety measures.  For example Directors Orders # 50C and the 2001 Management Policies both provide that:

> The means by which public safety concerns are to be met is left to the discretion of superintendent and other decision-makers at the park level, who must work within the limits of funding and staffing.  Examples include decisions about whether to install warning signs or artificial lighting  . . . initiate search and rescue operations, or render emergency aid; [and] eliminate potentially dangerous animals . . .

---

[8] The Government included only a portion of the NPS Sign Manual.  In a CD filed in support of its opposition, Plaintiff includes the entire manual. (*See* Doc. 76.)

(*See* Directors Orders # 50C at 2; 2001 Management Policies at ¶ 8.2.5.1.)  Similarly, the NPS

Sign Manual provides that:

> [T]he individual park manager, following the guidelines and procedures set down
> in PS-52, has the responsibility for determining whether or not a sign is necessary
> or appropriate at a given location.  The decision to utilize a particular sign at a
> particular location requires the professional judgment of the park manager . . .

(NPS Sign Manual at 1-1.)[9]

Citing *Summers v. United States*, 905 F.2d 1212 (9th Cir. 1990), Plaintiff argues that NPS

guidelines require that the NPS, upon learning of an unsafe condition which poses an imminent

risk of serious harm or death, abate that risk as soon as possible.  (Pl.'s Opp. at 6.)  In *Summers*,

the Ninth Circuit determined that under NPS policy, "corrective action by park officials is

mandated as soon as a hazard is identified as posing a risk of serious injury to the public."[10]

*Summers*, 905 F.2d at 1215.  Plaintiff maintains that the NPS was aware of the increase in the

barracuda population (due to the fishing ban at the Monument) and the risk that this presented to

visitors at the shoreline.  Plaintiff concludes that since the NPS is required to abate known risks

and knew about the risk barracuda presented to shore bathers, it had no discretion when it came

to warning visitors about the dangers of barracuda in shallow waters.[11]

---

[9] In his deposition, Joel Tutein, the Superintendent of the Buck Island Monument, testified that
this sign manual was in effect at the time of the incident.  (Tutein Depo. 48:13-49:4.)

[10] The *Summers* Court did not identify the statute, rule, or regulation that requires corrective
action by NPS officials once they become aware of a hazard posing a risk of serious injury to the
public. However, the NPS Sign Manual states that "Whenever there is a hazard that might
reasonably be expected to result in injury to Service personnel or the visiting public, signs
warning of the hazard must be installed."  (NPS Sign Manual at 4-4.)

[11] Plaintiff's brief focuses almost exclusively on the alleged failure to warn and cites no policy or
regulation mandating staffing decisions of park rangers at Buck Island.

Plaintiff's reliance on *Summers* is flawed for several reasons. First, recent Ninth Circuit jurisprudence has limited *Summers* to its facts and "marginalized [*Summers'*] importance." *Terbush v. United States*, 516 F.3d 1125, 1136 (9th Cir. 2008) (finding that decision by NPS not to post signs warning of recent rockfall at Yosemite National Park was discretionary); *Blackburn v. United States*, 100 F.3d 1426, 1431 (9th Cir. 1996) (finding that NPS decision not to warn of danger of diving off bridge in Yosemite National Park was discretionary because "the statutes and regulations under which the NPS operated in the present case necessarily encompass an element of discretion in deciding how and when to warn the public of known dangers.").

Second, even assuming that the holding relied on by Plaintiff in *Summers* is applicable, the *Summers* court ultimately declined to find that the NPS lacked discretion in its alleged failure to post signs warning that fire pits might contain hot coals because "Park Service rangers had not identified the risk of stepping on hot coals as a serious safety hazard prior to [plaintiff's] injury." *Summers*, 905 F.2d at 1215. Thus, at most, *Summers* stands for the proposition that the NPS has no discretion when it comes to warning of a danger that it has identified as "posing a risk of serious injury to the public." Here, as discussed above, Plaintiff has presented insufficient evidence to show that the NPS had identified barracuda as posing a serious risk to shallow water bathers prior to Plaintiff's May 9, 2004 attack.[12] While the Court recognizes that the NPS' awareness of a hazardous condition touches on the merits of Plaintiff's tort claim, despite the benefit of full-blown discovery, Plaintiff has not mustered enough evidence to show that the NPS had identified shoreline barracuda attacks as "posing a risk of serious injury to the public"

---

[12] This is not to suggest that the NPS acknowledged a serious risk of shoreline barracuda attacks following Plaintiff's attack.

sufficient to trigger a mandatory warning sign under the standard announced in *Summers*. *See Summers*, 905 F.2d at 1215.

Finally, case law both inside and outside this Circuit supports the proposition that decisions by the NPS regarding signage and safety measures involve an "element of judgment or choice" as to satisfy this step of the discretionary function exception analysis. *See Cestonaro*, 211 F.3d at 755 (finding that NPS' decision not to post sign warning of dangers of nighttime parking in lot owned by NPS was discretionary); *Merando*, 517 F.3d 160 (finding that NPS' method of locating and removing dead trees from national park "required the exercise of discretion."); *Mitchell,* 225 F.3d at 362 (finding that NPS' decision not to repair or improve a drainage ditch and concrete head-wall located five feet west of a paved roadway in national recreation area was discretionary); *Terbush*, 516 F.3d at 1136 (finding that decision by NPS not to post signs warning of recent rockfall at Yosemite National Park was discretionary); *Oberson v. U.S. Dept. of Agriculture, Forest Service*, 514 F.3d 989, 997 (9th Cir. 2008) (Forest Service's decision not post sign warning of steep decline on snowmobile track was not "mandated by regulation or statute" and thus discretionary); *Shansky v. United States,*164 F.3d 688, 692 (1st Cir. 1999) (finding that NPS' decision whether to post sign warning of stairs at exit of historical building was discretionary); *Blackburn,* 100 F.3d at 1431 (finding that NPS decision not to warn of danger of diving off bridge in Yosemite National Park was discretionary); *Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) ("Because the NPS cannot apprise the public of every potential danger posed by every feature of the Park, a degree of judgment is required in order to determine which hazards require an explicit warning and which hazards speak for themselves."); *Kiehn v. United States*, 984 F.2d 1100, 1103 (10th Cir. 1993) ("The decision whether or not to

post warning signs at Dinosaur National Monument is clearly discretionary as it 'involves an element of judgment or choice.' There is no statute, regulation or agency policy requiring the NPS to warn visitors of potential dangers, or more specifically, requiring the NPS to place signs which warn people that scaling sandstone cliffs may be dangerous.") (citations omitted); *Summers*, 905 F.2d at 1215 (decision not to post sign warning of hot coals on beach discretionary when NPS had received no prior "reports of injury from other beach visitors stepping on hot coals."); *Brown v. United States*, 661 F.Supp.2d 341, 362 (E.D.N.Y. 2009) (decision of NPS not to post signs warning of sandbars at beach was discretionary).

### iii. Can the conduct at issue be said to be grounded in social, economic, or political policy?

The final element that the Government must satisfy to be immunized by the discretionary function exception is that the challenged conduct be "susceptible to policy analysis" i.e. grounded in social, economic or political policy. *Cestonaro*, 211 F.3d at 753; *Merando*, 517 F.3d at 165. "Susceptibility analysis is not a toothless standard that the government can satisfy merely by associating a decision with a regulatory concern." *Cestonaro*, 211 F.3d at 755 (citation omitted). "The Court in *Gaubert* underscored the importance of the relationship between the discretionary decision and policy considerations, noting the exception applies only if the challenged actions can 'be said to be based on the purposes that the regulatory regime seeks to accomplish.'" *Id.* at 753 (quoting *Gaubert*, 499 U.S. at 325, n.7). Simply invoking broad policy concerns does not shield challenged conduct from tort liability. *See Gotha*, 115 F.3d at 181 (rejecting the government's appeal to broad policy considerations that "conceivably could go to any decision by the Navy" in determining that failure to install handrails or steps on steep hill was not protected by discretionary function exception). Rather, there must be a "rational nexus

between the National Park Service's . . . warning decisions (or non-decisions) and social, economic and political concerns." *Cestorano*, 211 F.3d at 759. This inquiry is "fact-specific." *Mitchell*, 225 F.3d at 365. Finally, the Court notes that the Government begins this step with the "strong presumption" that the challenged conduct involves policy considerations. *Gaubert*, 499 U.S. at 324.

### 1. The NPS' Staffing Decision

The Government contends that NPS' staffing decisions involve the weighing and balancing of funding limits, maintenance needs, project requirements, and visitor and resource protection. (Gov.'s Mot. at 19.)[13] Indeed, case law indicates that agency staffing decisions are susceptible to policy analysis. *See Varig Airlines*, 467 U.S. at 820 (explaining that decisions requiring an agency "to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding" are protected by the discretionary function exception); *Sharp ex rel. Estate of Sharp v. United States.,* 401 F.3d 440, 447 (6th Cir. 2005) (finding that Forest Service's staffing decisions "are of the kind that the discretionary function exception was designed to shield" because they are the product of balancing the needs of the entire park area with "budgetary constraints.") (internal quotations omitted); *Johnson v. U.S., Dept. of Interior*, 949 F.2d 332, 339 (10th Cir. 1991) (holding that "the rangers' decision if, when or how to rescue inherently involves the balancing of safety objectives against such practical considerations as staffing, funding and minimizing government intrusion. As such, these decisions are grounded in social

---

[13] Defendant does not respond to the Government's proffered policy justifications nor offer any argument regarding this aspect of his negligence claim.

and economic policy, and thus are shielded from liability under the FTCA discretionary function exception."); *Airplanes of Boca, Inc. v. U.S. ex rel. F.A.A.*, 254 F.Supp.2d 1304, 1309 (S.D. Fla. 2003) (holding that the government was "immune from liability pertaining to the staffing of the radar control room facility at Palm Beach Tower" pursuant to the discretionary function exception).

In addition, the Government has presented evidence that the NPS actually weighed policy considerations in making its staffing decisions, even though such a showing is not required. *See GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1178 (9th Cir. 2002) ("[T]he question is not whether policy factors necessary for a finding of immunity were in fact taken into consideration, but merely whether such a decision is susceptible to policy analysis."). Superintendent Tutein testified that whether personnel are stationed on Buck Island "depends on manpower availability" and that during May 2004, the month of the incident, there was insufficient manpower availability for the NPS to station law enforcement personnel on Buck Island. (Tutein Dep. 19:16-23; *see also* Starr-Hillis Dep. 18:20-19:8 (park employees are scheduled according to needs of particular projects).) Tutein also testified that there are first aid stations on Buck Island but they are not manned because of lack of manpower availability. (Tutein Dep. 20:5-18.) This evidence demonstrates that NPS' Buck Island staffing decisions involve a balancing of resource availability, project needs, and visitor and resource protection. Accordingly, the Court finds that the NPS' decisions regarding staffing at Buck Island are protected by the discretionary function exception and cannot support Plaintiff's claim for negligence.

## 2. Failure to Warn

Lastly, the Court turns to the question of whether the NPS' conduct surrounding its identification and warning of the dangers posed by barracuda is susceptible to policy analysis. The Government argues that because the NPS must consider "visitor safety, aesthetics, and resource protection" in determining whether a warning sign should be posted in a particular location, its conduct in this case regarding signage at Buck Island falls within the discretionary function exception. (Gov.'s Mot. at 16.)

First, the Court is not convinced that the lack of a specific warning to shore swimmers regarding barracuda has much to do with aesthetic policy concerns. A similar aesthetic policy argument was rejected in *Fabend v. Rosewood Hotels and Resorts, L.L.C.*, 174 F.Supp.2d 356 (D.V.I. 2001). There, the plaintiff suffered a catastrophic spine injury when he was driven head first into the sand by a shore-break wave at a beach in Cinnamon Bay on St. John. *Id*. at 357. The plaintiff sued the NPS for failing to post signs warning of the danger of shore breaking waves at Cinnamon Bay, when it had posted other warning signs at Cinnamon Bay and signs warning of shore breaking waves at nearby Trunk Bay, "which is much less developed and thus more scenic and pristine than the Cinnamon Bay Campground." *Id*. at 359. The court rejected the government's aesthetic policy argument finding that the "presence of these various signs at [Cinnamon Bay] along with the Park's decision to post a warning sign at the more pristine Trunk Bay contradicts the government's aesthetics argument." *Id*. at 360. Likewise, in the instant case, the NPS had already erected signs on Buck Island providing visitors with "Safety Tips for Sea and Shore." The Government offers no explanation how additional language on those signs would diminish the natural beauty of Buck Island any more than the signs themselves. *See Cope*

*v. Scott*, 45 F.3d 445, 451 (D.C. Cir. 1995) (rejecting application of discretionary function exception to failure to post warning sign on side of road in Rock Creek Park because "no less than twenty-three traffic control, warning, and informational signs already exist on the half-mile stretch of road bracketing the curve on which the accident occurred"); *Cestorano*, 211 F.3d at 756 (rejecting argument that decision (or non-decision) by NPS not to post signs warning of danger at parking lot owned by NPS "were grounded in its overarching objective of returning the area to its historic appearance.").

The Court now turns to the Government's "visitor safety" and "resource protection" policy argument. Citing *Mitchell, Merando*, and other cases, the Government argues that NPS' decisions on whether and how to warn visitors about barracudas within and around Buck Island are susceptible to policy analysis. A review of these and other discretionary function failure to warn cases reveals two general principles regarding "visitor safety" policy justifications. First, case law indicates that the manner in which the NPS identifies, abates and warns of hazards, once discovered, are the types of decisions susceptible to policy analysis. For example, in *Merando*, the plaintiff, whose wife and daughter were killed by a falling tree while driving on a road inside the Delaware Water Gap National Recreation Area, sued the United States for failing to find and remove the hazardous tree. *Merando*, 517 F.3d at 167. The Court held that the discretionary function exception applied because "the controlling statutes, regulations, and policies . . . did not mandate any particular methods of hazardous tree management . . . the Government had to determine and weigh the risk of harm from trees in various locations [and] the need for other safety programs, the extent to which the natural state of the forest should be preserved, and the limited financial and human resources available." *Id.* at 172.

In *Mitchell*, the plaintiff was involved in an automobile accident and sued the United States for failing to repair or improve a drainage ditch and concrete head-wall five feet west of a paved roadway in a national recreation area. *Mitchell*, 225 F.3d at 362. The Court applied the discretionary function exception finding that the NPS was "forced to determine priorities among the desirable improvements" to the road in question and that the alleged default in the road complained of by the plaintiff presented only a "low risk of an accident." *Id*. at 366. *See also Elder v. United States*, 312 F.3d 1172, 1183-84 (10th Cir. 2002) (manner and wording of warning sign involves an element of policy consideration); *Valdez,* 56 F.3d at 1180 ("The related decision regarding which natural hazards should be brought to the attention of the public through pamphlets or brochures similarly implicates public policy concerns. Faced with limited resources and unlimited natural hazards, the NPS must make a public policy determination of which dangers are obvious and which dangers merit the special focus of a warning brochure or pamphlet."); *Cleveland v. United States*, 546 F.Supp.2d 732, 760 (N.D. Cal. 2008) ("[T]he Forest Service's decisions regarding the identification, marking, monitoring, and abatement of possible hazards implicated competing policy concerns, including environmental considerations, public access and safety considerations, resource allocation, and the fact of the National Forest's limited resources.").

Second, NPS decisions regarding signage that do not fall within the exception tend to involve the failure to warn of a known (and often documented) hazard or danger.[14] For example,

---

[14] In some failure to warn cases, courts have applied the discretionary function exception to NPS' decisions not to post signs warning of dangers known to the NPS. However, in those cases, it was clear that the decision not to post warning signs in the park was part of an avowed policy to keep the park as primitive or scenic as possible. *See, e.g., Kiehn v. United States*, 984 F.2d 1100, 1105 (decision not to place warning signs on unstable rock formations at petroglyph site was part

in *Cestorano*, the plaintiff brought a wrongful death complaint against the United States after her husband was shot and killed in a parking lot located on land owned by the NPS. *Cestorano*, 211 F.3d at 752. In finding that the NPS' failure to post a warning sign at a parking lot fell outside the exception, the Third Circuit noted that it was "undisputed" that prior to the shooting, the NPS "was aware that crimes had occurred in the lot . . . In addition to crime incidents reports from the Virgin Island Police Department and its own park rangers, the National Park Service also received regular complaints about safety in the Hospital Street lot from local business owners." *Id*. In *Gotha*, the plaintiff sued the United States for negligently failing to install handrails or lights on a steep trail at a Navy base. *Gotha*, 115 F.3d at 177. Noting that "the Navy had been asked on two or three occasions to build a stairway or install a handrail to ease travel down the path, but that these requests had been rejected," the Court declined to apply the exception finding that the case was "not about a national security concern, but rather a mundane, administrative, garden-variety, housekeeping problem that is about as far removed from the policies applicable to the Navy's mission as it is possible to get." *Id*. at 180-81.[15] In *Oberson*, a case cited by Plaintiff, the Ninth Circuit held that failure by the Forest Service to post a sign warning of a steep hill on a snowmobile trail was not protected by the exception because "the Forest Service

of policy to protect natural scenery); *Zumwalt v. United States*, 928 F.2d 951, 955 (10th Cir. 1991) (applying exception to alleged NPS failure to warn of trail danger in wilderness area because "the absence of warning signs was part of the overall policy decision to maintain the Trail in its wilderness state."). This does not appear to be the case here as the NPS has acknowledged that it placed two kiosks on Buck Island, both of which featured "Safety Tips for Sea and Shore."

[15] In *Mitchell*, the Third Circuit made it clear that its decision in *Gotha* not to apply the exception was heavily influenced by the fact that the Navy had received prior warnings about the handrail and knew about the dangerous trail: "[The] agency decision went beyond the ambit of appropriate discretion when the agency ignored *blatant safety hazards* that could have been repaired through routine periodic maintenance mandated by explicit policy." *Mitchell*, 225 F.3d 361 (emphasis added).

knew of the hazard through its own investigation, which disclosed that sixteen days prior to [plaintiff's] accident the hill in question had been the site of a potentially serious collision between a snow grooming machine and two snowmobiles." *Oberson*, 514 F.3d at 998. Finally, in *George v. United States*, a case involving an alligator attack in an established swimming area in Conecuh National Forest, the district court found that Forest Service's failure to warn swimmers of the alligator was not protected by the discretionary function exception because prior to the attack, "at least six incidents of aggressive alligator behavior had been reported to various forest officials . . . Since the danger presented by the reptile(s) was known by the forest officials, there was no discretion to fail to take any remedial measures." *George v. United States*, 735 F.Supp. 1524, 1529-33 (M.D. Ala. 1990); *see also Faber v. United States*, 56 F.3d 1122, 1126 (9th Cir. 1995) (finding that exception did not apply to Forest Service failure to post warning signs at Tanque Verde Falls when it was "undisputed that . . . the Forest Service knew that a significant number of diving accidents were regularly occurring at the Falls."); *Sutton v. Earles*, 26 F.3d 903, 910 (9th Cir. 1994) (holding that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect."); *Boyd v. U.S. ex rel. U.S. Army, Corps of Engineers*,  881 F.2d 895, 898 (10th Cir. 1989) ("An alleged failure to warn swimmers of dangerous conditions [motor boats] in a popular swimming area does not implicate any social, economic, or political policy judgments with which the discretionary function exception properly is concerned . . . the dissent fails to point out what public policy considerations possibly could be involved in the COE's decision not to warn snorkelers or swimmers of *known* dangers in the Crappie Point area.") (emphasis added); *Fabend,* 174 F.Supp.2d at 360 (finding that exception did not apply when the "danger here is

well-defined and specific, not a nebulous or hidden danger . . . Where the danger is specific rather than merely potential, the discretionary function exception may not protect a government agency's failure to warn.").

Applying these two principles, the Court finds that the NPS' conduct in identifying hazards to park visitors and its decisions regarding the content of the warnings given to visitors is the type of conduct that the discretionary conduct exception was designed to exclude from tort liability. The NPS 2001 National Management Policies provides that "the service will strive to identify *recognizable threats* to the safety and health of person . . . [w]hen practicable, and consistent with congressionally designated purposes and mandates, the Service will reduce or remove *known* hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education." (2001 Management Policies at ¶ 8.2.5.1.) (emphasis added).[16] This management policy does not specify how the NPS is meant to identify and abate hazards and both *Merando* and *Mitchell* demonstrate that the NPS' discretion in how it identifies dangerous conditions is policy driven. While the Navy's determination of whether a steep unlit trail presents a hazard might not be said to involve policy considerations (*Gotha,* 115 F.3d at 181), the same cannot be said about identifying the dangers posed by marine creatures to park visitors. Far from being "a garden-variety, housekeeping problem," this sort of determination turns on availability of park personnel and research staff to identify hazards, access to research, available funds to do that research, and NPS' priorities in identifying safety issues. (*See, e.g.,*

---

[16] Consistent with that policy statement, Hillis-Starr testified that part of her job duties includes identifying hazards to humans that stem from natural conditions affecting Buck Island and reporting those hazards up the chain of command and to law enforcement, when appropriate. (Hillis-Starr Dep. 13:13-14:16, 16:12-18:1.) She did not testify as to any specific policy or rules that guide how she must identify hazards.

Director's Order #50C at 2 ("The means by which public safety concerns are to be met is left to the discretion of superintendent and other decision-makers at the park level, *who must work within the limits of funding and staffing*. Examples include decisions about whether to install warning signs . . . [and] eliminate potentially dangerous animals . . .") (emphasis added); Buck Island Reef Brochure at 4 (noting that NPS studies many facets of the Buck Island ecosystem, including its fish, visitor activity impacts, effects of hurricanes and human caused disasters, exotic plants, and endangered species).)[17] And once a marine organism is identified as posing some risk to humans, the NPS must then balance that risk against the cost of warning about that hazard and the possibility of overloading visitors with unnecessary warnings. *See Valdez,* 56 F.3d at 1180 (finding that "too many warning brochures and pamphlets would inevitably reduce the impact of the individual warnings on the public . . . therefore, the NPS must balance the goal of public safety against competing fiscal concerns as well as the danger of an overproliferation of warnings."); *Bergquist v. U.S. Nat. Weather Service*, 849 F.Supp. 1221, 1228 (N.D.Ill. 1994) (holding that National Weather Service forecasts fell within discretionary function exception because "the decision-making process is one involving the exercise of judgment and a balancing of countervailing policy goals-accuracy of weather forecasting and warning on the one hand, counterbalanced against greater effectiveness on the other."); *see also Childers*, 40 F.3d at 976

---

[17] Plaintiff also argues that the NPS failed to offer any evidence that shows that its warning decisions "was the result of a policy decision." (Pl.'s Opp. at 7.) However, "[t]he test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion." *Gotha*, 115 F.3d at 180 (citations and internal quotation marks omitted); *see also Childers*, 40 F.3d at 974 (citing *Gaubert*, 499 U.S. at 324-24) ("[T]he application of the exception does not depend . . . on whether federal officials actually took public policy considerations into account. All that is required is that the applicable statute or regulation gave the government agent discretion to take policy goals into account.").

("[D]ecisions as *to the precise manner* in which NPS would warn the public . . . clearly fall within the discretionary function exception.") (emphasis in original).

Furthermore, unlike the cases cited by Plaintiff in his opposition, this case does not involve a failure to warn of a known or previously identified hazard. The Government argues that the "NPS had no knowledge that a barracuda attack in shallow water was likely" (Gov.'s Mot. at 14) and has presented considerable evidence that the risk of any barracuda attack was extremely remote – one incident per several hundred thousand visitors over at least a twenty-two year period. *See Mitchell*, 225 F.3d at 366 (finding that NPS' decision not to repair concrete culvert head wall to be within exception because it had to "balance costs of the repairs . . . against the low risk of accident"); *Brown v. United States*, 661 F.Supp.2d 341, 363 (E.D.N.Y. 2009) (finding that evidence that "that there was a low incidence of diving injuries from running into the ocean, with only 0.6% of diving injuries caused when an individual made a running dive into the ocean" supported application of discretionary function exception to decision by NPS not to post signs on beach warning of sandbars); *Zuk v. United States,* 698 F.Supp. 1577, 1580 (S.D. Fla. 1988) (evidence that plaintiff was the only person to ever have fallen from second story of historic fort weighed in favor of applying exception to his negligence claim because to allow liability "would render the government the insurer of the safety of all visitors to the Fort."). Plaintiff's only evidence that the NPS had any knowledge of a risk of close-to-shore barracuda attacks is the single prior attack on the boat captain, the NPS acknowledgment that barracuda can be encountered near the shore, and his assertion that the statutory fishing ban resulting in an increase in the barracuda population. As discussed above, however, even under the lightened evidentiary burden imposed by *Gould Electronics* and *CNA,* this evidence is nowhere close to

establishing the level of NPS' knowledge of a dangerous condition present in other failure to warn cases.[18]  *See, e.g., Cestorano*, 211 F.3d at 752 (multiple reports of criminal activity); *Oberson*, 514 F.3d at 998 (internal investigation revealed specific hazard two weeks before accident in question); *Faber,* 56 F.3d at 1126 (knowledge of a "significant number of diving accidents" in same place as plaintiff's accident); *George,* 735 F.Supp. at 1529-33 (knowledge of "at least six incidents of aggressive alligator behavior" prior to plaintiff's attack).

Plaintiff cites *Oberson*, 514 F.3d 999, for the proposition that while the decision to warn about barracuda might have been discretionary, once the NPS decided to warn about barracuda at all, it had the obligation to do so in a non-negligent manner.  (Pl.'s Opp. at 7.)  *Oberson*, however, does not support Plaintiff's contention.  In *Oberson*, the evidence demonstrated that the Forest Service had an established policy of "warranting" trails on the Big Sky Trail, a groomed snowmobile trail managed by the Forest Service, which involved riding the trails during the day to "identify[] the hazards that our average, prudent, reasonable rider would not expect based on a spectrum of users that we had out there."  *Oberson*, 514 F.3d at 994-95.  Under the "warranting" policy, "[u]pon identifying a hazard, the Forest Service closes the trail, corrects the hazard, or

---

[18] In his opposition Plaintiff cites *Mandel v. United States*, 719 F.2d 963 (8th Cir. 1983) for the proposition that this Court must infer from the evidence that the NPS was aware of the risk of barracuda attacks for the purposes of this motion.  However, *Mandel* involved a motion for summary judgment under Rule 56, not a subject matter jurisdiction challenge under Rule 12(b)(1).  *Id.* at 964 ("In this appeal from a summary judgment, all facts must be viewed in the light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences to be drawn from the facts.").  Moreover, while *Mandel* was a suit brought under the FTCA, it did not involve the discretionary function exception.  Finally, the *Mandel* court found that plaintiff had raised a question of material fact regarding the NPS' knowledge of the danger of submerged rocks at a particular swimming hole because the plaintiff had presented evidence that park rangers "knew that submerged rocks were all up and down the river" and "were aware of the hazards of submerged rocks in the river." *Id.* at 968.  Here, in contrast, Plaintiff's evidence does not show that the NPS knew that barracudas posed a risk to shore bathers.

warns the user." *Id*. at 995.  The Forest Service had warranted the trail at 35 mph in 1993; however, in 1996, the Forest Service raised the speed limit on the trail to 45 mph without rewarranting the trail.  *Id.* at 997-98.  The court found that because the Forest Service violated its own warranting policy, its actions were not protected by the discretionary function exception. *Id*. at 997-99.

Plaintiff's reliance on *Whisnant v. United States*, 400 F.3d 117 (9th Cir. 2005) and *Soldano v. United States*, 453 F.3d 1140 (9th Cir. 2006) is similarly misplaced. In *Whisnant*, the Ninth Circuit held that the plaintiff's allegations, which it accepted as true because the government had only asserted a facial challenge under 12(b)(1), established a claim that the Navy had violated its own safety procedures in "negligently ignor[ing] health hazards that were called to its attention." *Whisnant*, 400 F.3d at 1185.  The court found that "[b]ecause removing an obvious health hazard is a matter of safety and not policy, the government's alleged failure to control the accumulation of toxic mold in the Bangor commissary cannot be protected under the discretionary function exception." *Id*. at 1183.

Similarly, in *Soldano*, the Ninth Circuit held that a negligence claim based on the NPS' decision to post a 35 mile-per-hour speed limit on a park road was not excluded by the exception because "the Road's 35 m.p.h. speed limit at the accident location is at odds with the specifications in Table 6 of the Standards, which require a speed limit of no more than 25 m.p.h. for roads with the characteristics of the accident site." *Soldano*, 453 F.3d at 1148.  The court then found that the "Park Service's decision not to implement a speed limit on the Road consistent with the Standards' safety guidelines resembles more a departure from the safety considerations established in Service policies . . . than a mistaken judgment in a matter clearly

involving choices among political, economic, and social factors." *Id*. at 1148-49. Together, *Oberson, Soldano* and *Whisnant* stand for the proposition that agency decisions violative of an established safety protocol are not within the discretionary function exception. But here, the NPS had no established protocol or policy regarding the warning of barracuda or any sea creatures for that matter. That the NPS warned park visitors that barracuda "should be treated with caution but are not usually aggressive toward snorkelers" does not establish NPS safety policy toward barracuda, nor require the NPS to exhaustively identify and list all risks that barracuda might present. The Court does not believe that Congress created the discretionary function exception only to force the NPS into the Catch-22 of choosing between issuing no warnings at all and posting warnings about every conceivable danger, no matter how remote or hypothetical. Such a rule would "seriously handicap efficient government operations" and encourage the NPS to stick its head in the sand to avoid discovering safety hazards. *Varig Airlines*, 467 U.S. at 814. Accordingly, the NPS' conduct challenged by Plaintiff's failure to warn claim is within the ambit of the discretionary function exception and cannot form the basis of the Government's liability.[19]

IV.   **Conclusion**

For the foregoing reasons, the Court **GRANTS** the Government's Motion to Dismiss.

**ENTERED**

Dated: September 30, 2010                    _____/s/_____
                                             RAYMOND L. FINCH
                                             SENIOR U.S. DISTRICT JUDGE

---

[19] Because the Court determines that it lacks subject matter jurisdiction over Plaintiff's claims, it does not reach the other arguments made by the Government.